

# THE ATTORNEY GENERAL OF TEXAS

AUSTIN, TEXAS 78711

CRAWFORD C. MARTIN
ATTORNEY GENERAL

January 4, 1972

Hon. Bevington Reed, Commissioner
Coordinating Board,
Texas College and University System
Capitol Station
Austin, Texas 78711

See H-LA-47

Opinion No. M-1036

Re: Legality of possible contractual agreement between the proposed Taylor County Junior College District and certain private church-related institutions.

Dear Dr. Reed:

Your letter requesting the opinion of this office is quoted as follows:

"The Coordinating Board, Texas College and University System, charged under law with approving elections for the purpose of establishing junior college districts, has received a petition from the steering committee of Taylor County requesting the approval of an election for the creation of a junior college district. All the materials related to the proposal are attached.

"As an integral part of the plan placed before the Coordinating Board, it is proposed that the Taylor County Junior College District contract with Abilene Christian College, Hardin-Simmons University, and McMurry College for the provision of certain academic services which normally would be provided by the junior college district, specifically in the area of academic courses

"It is noted that the proposed By-Laws for Taylor County Junior College Board of Trustees provides that 'it shall be forever the policy of the Board of Trustees to utilize the resources of existing private colleges for the benefit of college students and adult continuing education by contractual agreements with said private colleges.'

"Question: Would such a contractual arrangement between the proposed Taylor County Junior College District and the private church-related colleges of Abilene be legal?"

Among the materials provided with your request we have an excellent document entitled "A Study of Higher Education For Abilene, Texas," by Dr. J. R. Woolf, and a sample of the type of contract that the yet-to-be-created Taylor County Junior College District proposes to enter into with McMurry College, Hardin-Simmons University and Abilene Christian College. Without going into exhaustive detail, we view the overall proposal as containing the following elements:

1. Creation of Taylor County Junior College District by election, with simultaneous approval of bond issue;

2. Construction of administration and instruction building with bond proceeds. (Vocational and technical instruction on the junior college level will be carried on in this facility.)

3. Contracts with the three private institutions in Abilene for conduct of primarily academic courses. Contract students are students of Taylor County Junior College, but entitled to sign up for courses on whichever of the three campuses they prefer, and entitled to fully participate in the student life

of that campus. Such students may not be required to participate in any religious function carried on on campus. The payment provisions of the contracts specifically and carefully exclude payment for any activity connected with any religious purpose at any of the schools. Such payments are made on a student hour basis, and the elements of costs which go to make up that basis are carefully set out.

The proposed plan of operation is unique in this State. In reviewing this plan we make no comment concerning the educational and financial feasibility of the program, as these are matters within the authority of the Coordinating Board, Texas College and University System, under Section 51.001, Education Code. Our opinion is limited solely to the proposed contracts between Taylor County Junior College and the three private institutions. It is to be understood that the submitted contract has not been examined for general approval; our analysis has been limited to the matter of whether such a junior college district has general authority to enter into this particular type of contract with church-connected private institutions.

At the outset of our analysis, we note the provisions of Section 51.073, Education Code:

> "The board of trustees of junior college districts shall be governed in the establishment, management and control of the junior college by the general law governing the establishment, management and control of independent school districts insofar as the general law is applicable."

The general powers of a board of trustees for an independent school district are set out in Section 23.25, Education Code. The enumeration of powers set forth therein does not specifically include the power to contract, but the existence of such power in an agency or administrative body is necessarily implied in carrying out the functions and duties assigned. See Crosby vs. P. L. Marquess & Co., 226 S.W.2d 461 (Tex.Civ.App., 1950, n.r.e.);

Pritchard & Abbott vs. McKenna, 350 S.W.2d 333,334 (Tex.Sup. 1961). In carrying out its basic function of providing educational facilities and programs for its students, we have no doubt that a junior college district would have authority to contract for necessary services and supplies. In the instant case, the proposed system of contracts is designed to provide academic opportunities for students enrolled in the Taylor County Junior College. As previously mentioned, we are in no position to comment on the educational aspects of this proposed system, and we can only state that, from the legal viewpoint, a contract which has as its objective the provision of academic opportunity is within the implied authority of the junior college board of trustees.

McMurry College, Hardin-Simmons University, and Abilene Christian College are all institutions of higher education that were founded by religious societies. Such societies continue to play a major role in the operation and financing of these schools. Notwithstanding such a connection, however, the proposed contract would require each school to agree to admit any contract student without regard to race, creed or color, and to make no demands of a religious nature upon any such student.

On June 28, 1971, the United States Supreme Court issued two landmark decisions in the area of government-church relations, Lemon vs. Kurtzman (and its companion case Earley v. DiCenso), 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745, and Tilton vs. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790. The Lemon decision dealt with challenges to Pennsylvania and Rhode Island statutes which provided state aid to parochial school teachers for teaching strictly secular courses to pupils enrolled in parochial schools. The Tilton decision upheld the Federal Higher Education Facilities Act of 1963, 20 U.S.C. Sec. 711 et seq., permitting appropriations for construction for college and university facilities not used for sectarian instruction or as a place for religious worship. The Court in the Lemon decision held that the state statutes violated the First Amendment of the U. S. Constitution, observing, inter alia, that the

statutes required the state governments to examine the schools' records to determine that statutory requirements were being met, declaring:

> "This kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids."

The Court distinguished the decisions in Everson v. Board of Education, 330 U.S. 1 (1947), upholding state payments for the busing of children to parochial schools, and Board of Education v. Allen, 392 U.S. 236 (1968), upholding the purchase of textbooks for secular courses in parochial schools.

The Court reasoned that in those cases the payments were made to the students, not the schools. With regard to the payments to teachers, the Court said:

> "/T/eachers have a substantially different ideological character than books. In terms of potential for involving some aspect of faith or morals in secular subjects, a textbook's content is ascertainable, but a teacher's handling of a subject is not."

The following is quoted from the opinion of the Supreme Court by Chief Justice Burger in Tilton v. Richardson, cited supra, quoting from page 4:

> "There are always risks in treating criteria discussed by the Court from time to time as 'tests' in any limiting sense of that term. Constitutional adjudication does not lend itself to the absolutes of the physical sciences or mathematics. The standards should rather be viewed as guidelines with which to identify instances in which the objectives of the Religion Clauses have been impaired. And, as we have noted in Lemon v. Kurtzman and Earley v. DiCenso, decided today, candor compels the acknowledgment

that we can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication.

"Against this background we consider four questions: First, does the Act reflect a secular legislative purpose? Second, is the primary effect of the Act to advance or inhibit religion? Third, does the administration of the Act foster an excessive government entanglement with religion? Fourth, does the implementation of the Act inhibit the free exercise of religion?" (Emphasis added.)

Although our constitutional provision requiring the separation of church and state, Article I, Section 7, Texas Constitution, stands separate and apart from the prohibitions of the Federal Constitution, it is our view that the federal limitations as announced by the decisions of the U. S. Supreme Court are binding upon the Texas courts and our constitutional provisions must be interpreted in harmony therewith.

Fully understanding that the above and foregoing criteria are broad tests within which can co-exist many fact situations about which reasonable men can differ, we have reached the following conclusions with regard to the proposed contracts by the as-yet-unformed Taylor County Junior College District:

(1) The purpose of the proposed contracts seem to be clearly set out in the contracts themselves, taken together with the comprehensive study done by Dr. J. R. Woolf. We have no problem in concluding that, as a matter of law, the intent of the proposed contracts is to further the educational opportunities open to the people of Taylor County and its environs.

(2) Whether the proposed contracts would have the effect of advancing or inhibiting religion is a somewhat more troublesome question. Lemon concerned itself deeply with the religious

impact sustained by elementary and secondary school children studying in parochial schools. The Court found that the religious purpose served by the existence of these schools could not help but have an impact upon the impressionable children in these schools, and, ultimately, that state aid to the parochial school teachers served to aid the advancement of religion.

Tilton, on the other hand, dealt with college-level institutions, and rather summarily found that college students of this era are not particularly susceptible to religious indoctrination. The Court found that the possibilities for advancement of religion, given the safeguards of the statute, were minimal. It is our view that the safeguards of the proposed contracts provide adequate protection from religious indoctrination for the proposed junior college students herein, even though such students are in a category somewhat different from four-year college students.

Although we do not feel that the proposed contracts are an advancement of religion in the sense that they would operate to aid in proselyting a religion among public students, we cannot ignore the question of whether the influx of contract students, with the attendant cash flow, is an "advancement" within the prohibited area. Realizing that this is primarily a question of fact which this office does not have the authority to resolve, we can only point out that the contracts, on their face, provide for a quid pro quo. The various colleges, in return for a cash payment, are to provide educational services, including campus, faculty and extracurricular activities. Since the schools must provide all these services to their regular students, it is our view that the face of the contract provides no apparent basis for finding that there would be a prohibited advancement of religion.

(3) Does the administration of the contracts foster an excessive government entanglement with religion? The Supreme Court dealt tentatively with the "excessive entanglements" test

in Walz v. Tax Commission, 397 U.S. 664 (1970), and then adopted it wholeheartedly in both Lemon and Tilton, supra. In Tilton the Court found that the construction grant to a college was a one-time affair, and that future checks as to building use were de minimus, and thus that no excessive governmental contacts were incurred.

On the other hand, in its Lemon decision, the Court found that the future state contacts in administering payments to parochial school teachers extended to detailed curriculum examination by State education officials and continuing financial review by both educational officials and auditing officials. The Court concluded that contacts of this type, on such a continuing basis, could not help but inject the State, with all its power, deeply into the affairs of religious institutions. The instant contracts provide expressly for continuing contract administration by the officials of the junior college district, and some supervision by the Coordinating Board, Texas College and University System. It is also inevitable that the State Auditor's office would be required to examine the various books and records involved in the disbursement of State supported funds. In sum, we can discern no essential difference between the State contacts described in Lemon and those we have just outlined above. For "state inspection and evaluation of the religious content of a religious organization" is required, and the Supreme Court has declared this to be the sort of entanglement which is legally forbidden. You are accordingly advised that it is the opinion of the Attorney General that the proposed contracts submitted would require "excessive entanglement" between church and state, in violation of the First Amendment of the U. S. Constitution and Article I, Section 7, Constitution of Texas.

Our endeavor in this "sensitive area of constitutional adjudication" is quite candidly limited to an attempt to predict the attitude the Supreme Court of the United States would take if presented with the facts at hand. In making their decisions

in Lemon and Tilton, the Justices of the Supreme Court gave clear evidence of the difficulties that this kind of question poses in our type of society. From the language of the two cited opinions, we conclude that the highest court in our land would find that "excessive entanglements" exist in our fact situation.

Our prediction of the United States Supreme Court's view of our facts is further supported by the following language of Chief Justice Burger, quoted from Lemon:

> "A broader base of entanglement of yet a different character is presented by the divisive political potential of these state programs. In a community where such a large number of pupils are served by church-related schools, it can be assumed that state assistance will entail considerable political activity. Partisans of parochial schools, understandably concerned with rising costs and sincerely dedicated to both the religious and secular educational missions of their schools, will inevitably champion this cause and promote political action to achieve their goals. Those who oppose state aid, whether for constitutional, religious, or fiscal reasons, will inevitably respond and employ all of the usual political campaign techniques to prevail. Candidates will be forced to declare and voters to choose. It would be unrealistic to ignore the fact that many people confronted with issues of this kind will find their votes aligned with their faith.
>
> "Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect."

(4) Although the foregoing discussion makes the fourth test moot, we deem it advisable to state that we find nothing in the proposed contracts which would seem to have the effect of inhibiting the free exercise of religion.

## S U M M A R Y

Under the rationale of Lemon v. Kurtzman, 403 U.S. 602 (1971), and Tilton v. Richardson, 403 U.S. 672 (1971), the most recent decisions of the United States Supreme Court in the area of church-state relations, the system of anticipated contracts between the proposed Taylor County Junior College and McMurry College, Hardin-Simmons University and Abilene Christian College, whereby the three private institutions will accept students from the junior college, is violative of the First Amendment of the U. S. Constitution and Article I, Section 7, Texas Constitution, in that such contracts would require excessive entanglements between church and state.

Yours very truly,

CRAWFORD C. MARTIN
Attorney General of Texas

Prepared by Malcolm L. Quick
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Kerns Taylor, Chairman
W. E. Allen, Co-Chairman

Marietta Payne
J. C. Davis
Melvin Corley
Linward Shivers

SAM McDANIEL
Staff Legal Assistant

ALFRED WALKER
Executive Assistant

NOLA WHITE
First Assistant